**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

KEVIN PATRICK O'CONNELL,

          Defendant.

No. CR 05-48-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

*I.*     *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *FACTUAL FINDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*   *OBJECTIONS TO FACTUAL FINDINGS* . . . . . . . . . . . . . . . . . . . . . . *5*

*V.*    *OBJECTIONS TO LEGAL CONCLUSIONS* . . . . . . . . . . . . . . . . . . . . . *7*

      *A.*    *Legal Conclusions of the Report and Recommendation* . . . . . . . . . . *7*

      *B.*    *Objections* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

      *C.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

            *1.*    *Curtilage/Generalized Search* . . . . . . . . . . . . . . . . . . . . . *9*

            *2.*    *Automobile Search Exception* . . . . . . . . . . . . . . . . . . . . *12*

            *3.*    *Search Incident to Arrest Exception* . . . . . . . . . . . . . . . . *16*

       *4.      Attenuation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**VI.    CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

Before the court are Defendant Kevin O'Connell's Objections (docket no. 24) and the government's Response (docket no. 25) to the Report and Recommendation (docket no. 21) denying Defendant's Motion to Suppress (docket no. 12).

## *I. PROCEDURAL BACKGROUND*

On May 17, 2005, Defendant was indicted on one count of knowingly possessing a firearm and ammunition while subject to a no-contact order that restrained him from threatening, assaulting, stalking, molesting or otherwise abusing his wife, Kelly O'Connell ("Kelly"), in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2). On September 22, 2005, Defendant filed the instant Motion to Suppress ("Motion"). Defendant alleged law enforcement seized a shotgun and ammunition in violation of the Fourth Amendment. On October 4, 2005, the government filed a Resistance.

On October 12, 2005, the magistrate judge held a hearing on Defendant's Motion. On October 17, 2005, the government filed a Supplemental Resistance to Defendant's Motion. On November 7, 2005, the magistrate judge issued a Report and Recommendation, in which he recommended this court deny the Motion. *See generally United States v. O'Connell*, 2005 WL 2978326 (N.D. Iowa Nov. 7, 2005). On November 21 and 22, 2005, Defendant and the government respectively filed timely objections to the Report and Recommendation.

## *II. STANDARD OF REVIEW*

A district court judge must make a de novo determination of those portions of a magistrate judge's report or recommendation to which a party objects. 28 U.S.C. § 636(b)(1); *see, e.g., United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003).

The judge may accept, reject or modify, in whole or in part, the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1). Because Defendant and the government have made timely and specific objections in this case, the following *de novo* review is required.

## III. FACTUAL FINDINGS

After conducting a *de novo* review of the record, the court makes the following factual findings:

At approximately 2:30 a.m. on October 9, 2002, Kelly, the Defendant's wife, called the Linn County Sheriff's Office. Kelly reported that Defendant was in her house, in violation of a no-contact order. The Sheriff's Office confirmed that a state court had issued a valid no-contact order on September 20, 2002, and dispatched Sergeant Greg McGiverin, Deputy David Omar and Deputy Gary Van Cura to Kelly's house. Iowa law requires that if a law enforcement officer has probable cause to believe that someone has violated such a no-contact order, the officer must arrest that person. Iowa Code § 236.11 (2005).

While the officers were on their way to Kelly's house, Kelly told the Sheriff's Office that Defendant had left her house in a blue 1986 Ford Escort and was likely headed to his parents' house at 1199 Sisley Grove Road.[1] Sergeant McGiverin and Deputy Van Cura, who were driving separate vehicles, switched routes and went to 1199 Sisley Grove Road to arrest Defendant. Deputy Omar continued on to Kelly's house.

At approximately 2:45 a.m., Sergeant McGiverin and Deputy Van Cura arrived at 1199 Sisley Grove Road, which is a farm. Sergeant McGiverin was following

---

[1] The record does not indicate what city. The court assumes the farm is located somewhere in Linn County, Iowa.

Deputy Van Cura's vehicle. The two entered the property on a gravel lane.

Sergeant McGiverin and Deputy Van Cura traveled eastward on the gravel lane for approximately one-quarter mile, until they reached a gravel circular drive. There was a machine shed and a house on the gravel drive. The deputies continued eastward, driving past both buildings.

Sergeant McGiverin and Deputy Van Cura drove around the farm on various gravel and dirt pathways that connected the buildings on the property. Sergeant McGiverin and Deputy Van Cura were looking for the Escort. Sergeant McGiverin testified: "We basically drove through the lanes looking for the vehicle."

Deputy Van Cura found the Escort east of the house. The Escort was parked east of a number of outbuildings on the far (east) side of four cylindrical grain bins. A dirt path led between the far side of the grain bins and the Escort. The Escort was parked next to a field in some tall weeds. Deputy Van Cura made a "very rough estimate" that the Escort was approximately 100 yards away from the house.

The Escort was not visible from either a public road or from the circular drive next to the farmhouse. The Escort only became visible to Deputy Van Cura once he drove around the far side of the grain bins. The Escort was, however, visible from an open field east of the grain bins.

A 4.5 foot high barbed-wire fence surrounded the entire compound, i.e., the house, the outbuildings and the grain bins (but not the open field east of the grain bins). The Escort was parked inside the fence.

Upon discovering the Escort, Sergeant McGiverin got out of his vehicle and walked over to the Escort. Sergeant McGiverin used his flashlight to look inside the windows of the Escort. Defendant was not inside the Escort.

A gray conversion van was parked approximately five to six feet away from the

Escort. The van was parked in one to two-feet tall weeds. The van's front tires were flat and the front of it was badly damaged. The van did not have license plates and was not registered. The van was not operational. A month and a half before the date in question, the van was in an accident, "totaled" and towed to the farm.

Sergeant McGiverin looked through the van's windows inside the front passenger compartment of the van, but did not find Defendant. The van was completely silent and dark. Sergeant McGiverin opened one of the van's doors. Upon opening the door, he saw a plugged-in cell phone cord. Sergeant McGiverin called out Defendant's name. Defendant answered. Sergeant McGiverin drew his weapon, ordered Defendant out of the van and handcuffed and arrested him. Defendant was dressed in boxer shorts, a t-shirt, and socks.

Sergeant McGiverin searched the van. He found a loaded Remington twenty-gauge shotgun. Sergeant McGiverin also found three cases of empty beer cans and a case of full beer cans. It was apparent to Sergeant McGiverin that someone had been living in the van or was at least sleeping in it. There were a lot of blankets in the van and the back seat was folded down to make a bed. At some unknown point in time, Defendant told Deputy Van Cura that he had gone to the van to sleep.

## IV. OBJECTIONS TO FACTUAL FINDINGS

Defendant makes two objections to the factual findings in the Report and Recommendation. First, the Report and Recommendation states that Deputy Van Cura opened the van's door, initiated contact with Defendant and searched the vehicle. Defendant objects and points out that Sergeant McGiverin did these things. As the court's *de novo* factual findings make clear, Defendant is correct.[2] Accordingly,

---

[2] Although Deputy Van Cura testified at the hearing that they both searched the
(continued...)

Defendant's first objection to the factual findings in the Report and Recommendation is sustained.

Second, Defendant requests that the court modify the following factual finding in the Report and Recommendation:

> According to [D]efendant, the front end of the conversion van had extensive damage and the two front tires were flat. Neither officer noticed anything unique about the conversion van, and it was not apparent to either officer that the conversion van was not readily mobile.

Defendant maintains Sergeant McGiverin and Deputy Van Cura testified they could not remember whether the conversion van had sustained damage or was immobile. Defendant further asks that the court find that the van had the damage described by Defendant, because there is no clear contradictory evidence in the record.

At the hearing, Sergeant McGiverin testified he could not recall the condition of the van. Deputy Van Cura could not remember whether the van had flat tires or had license plates. When asked whether he recalled any "front end damage," Deputy Van Cura equivocated. He testified "[n]othing that was noticeable to me, as far as being major or caved in or anything." He further testified that "I think I would have remembered it, but I don't." Defendant testified the the van's front tires were flat, the front of the van was badly damaged, the van did not have license plates and the van was "totaled" in an accident a month and a half before his arrest.

As indicated in the court's *de novo* factual findings, the court finds the van's front tires were flat, the front of the van was badly damaged, the van did not have

---

[2](...continued)
vehicle, Sergeant McGiverin testified he opened the van's door, initiated contact with Defendant and searched the vehicle.

license plates and the van was not operational. Defendant had a better opportunity to know the condition of the van; Deputy Van Cura and Sergeant McGiverin saw the van in the middle of the night and when it was parked in tall weeds. Sergeant McGiverin testified he could not recall the condition of the van. Deputy Van Cura likewise could not remember or was equivocal about the van's condition. Accordingly, the court sustains Defendant's second objection to the factual findings in the Report and Recommendation.

The government does not make any factual objections to the Report and Recommendation.

## V. OBJECTIONS TO LEGAL CONCLUSIONS

### A. Legal Conclusions of the Report and Recommendation

The magistrate judge reached a number of legal conclusions in the Report and Recommendation. First, the magistrate judge held that the officers had probable cause to arrest Defendant. The magistrate judge pointed out that Kelly had told the officers that Defendant had violated a protective order, a protective order was in effect, and there is no indication in the record that Kelly had ever previously made a false report.

Second, the magistrate judge held that the officers "did not engage in a 'generalized search' of the kind that normally implicates Fourth Amendment interests" when they drove around the farm looking for the Escort, identified the Escort and the van and peered inside the windows of the Escort and the van. Although the magistrate judge assumed the van was in the curtilage of the farmhouse, he seized upon the fact that the officers (1) stayed on lanes designated for vehicular traffic, (2) quickly identified the Escort and (3) limited their search to determining whether Defendant was present.

Third, the magistrate judge held that the officers did not have probable cause to

open the van door. The magistrate judge reasoned that the mere fact the van was parked next to the Escort was not sufficient in itself to create probable cause that Defendant might be in the van.

Fourth, the magistrate judge found that the fact that the officers did not have probable cause to open the van door did not mandate suppression of the firearm and ammunition. The magistrate judge concluded the search of the van was a valid search incident to arrest. While the magistrate judge recognized that "but for" the illegal opening of the door the officers would not have found the Defendant, he determined that the search of the van was sufficiently distinguishable to be purged of the taint of the illegal opening of the van door. The magistrate judge found that "it would be 'startling to suggest that because the [officers] illegally [opened the van door], they could not arrest' the defendant who was found inside of the van and for whom probable cause existed to arrest based on the alleged violation of the protective order." *See O'Connell*, 2005 WL 2978326, at *5 (alterations in original) (quoting *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997)). The magistrate judge noted that the opening of the van door was not flagrant and there was no evidence of purposeful misconduct or bad faith on the part of the officers. *Id.*

### B. Objections

Defendant and the government object to most of the legal conclusions in the Report and Recommendation. Defendant objects to (1) the magistrate judge's legal conclusion that the officers did not engage in a generalized search of the farm that implicates the Fourth Amendment and (2) the legal conclusion that the officers' discovery of the shotgun and ammunition was sufficiently distinguishable to be purged of the taint of the illegal opening of the van door. The government objects to (1) the assumption in the Report and Recommendation that the van was within the curtilage of

the farmhouse and (2) the conclusion that there was no probable cause to believe Defendant would be found in the van.

## C. Analysis

### 1. Curtilage/Generalized Search

The first two issues presented for the court's review are whether the van was in the curtilage of the farmhouse and, if so, whether the officers conducted a "generalized search" within the ambit of the Fourth Amendment. The magistrate judge assumed, without deciding, that the van was in the curtilage but held the search was too generalized to implicate the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This right is "preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985). "The Fourth Amendment protects a home and its curtilage—the area immediately surrounding a dwelling house—from unreasonable warrantless searches." *United States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004) (citing *United States v. Dunn*, 480 U.S. 294, 300-04 (1987)). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U.S. at 300 (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The "central component" of the inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (internal quotation omitted).

The court must resolve curtilage questions with particular reference to four factors: (1) the proximity of the area to the home; (2) whether the area and the home

are within the same enclosure; (3) the nature and uses of the area; and (4) whether steps were taken to protect the area from being seen by passers-by. *Id.* at 301; *Gerard*, 362 F.3d at 487. These factors cannot be mechanically applied. *Dunn*, 480 U.S. at 301. Each case "'is distinctive and stands or falls on its own unique set of facts.'" *Gerard*, 362 F.3d at 487 (quoting *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998)).

The court finds that some of the factors weigh in favor of a finding that the officers intruded upon the curtilage of the house, while others weigh against it. Regrettably, the record is unclear as to a number of important facts.

The only evidence in the record regarding proximity is Deputy Van Cura's "very rough estimate" that the Escort was approximately 100 yards from the farmhouse.[3] If true, this would arguably weigh in favor of finding the officers were not on the curtilage of the house when they examined the Escort and the van. *See Dunn*, 480 U.S. at 302 (finding sixty-yard distance from house to barn "supports no inference that the barn should be treated as an adjunct of the house"). Because the officers searched other areas of the compound, however, it is unclear whether they traipsed across the curtilage at an earlier time.

Regarding enclosures, a barbed-wire fence surrounded the house, the Escort, the van, and a number of outbuildings on the farm. This fact weighs in favor of a finding that the officers intruded upon the curtilage of the house; the Escort, the van, and the house were within the same enclosure. *Cf. id.* (concluding that the fact that a second fence enclosed only the house weighed against finding the barn was within the curtilage

---

[3] Government Exhibit 1 is an aerial photograph of the farm, but does not indicate scale.

of the house).  As Defendant testified, the fence was intended "to separate the fields from the house [and] to keep the livestock from entering the personal property."

The government presented little to no evidence about the uses of the areas in which the officers traveled and found the vehicles.  There is little affirmative evidence in the record to show this area was not used for intimate activity associated with the home.

Lastly, the evidence is mixed concerning the steps taken to prevent passers-by from viewing the Escort and the van.  On the one hand, the Escort and the van were visible from a neighboring field; this weighs in favor of a finding that the area in which they were found was not part of the curtilage of the home.  *Dunn*, 480 U.S. 302.  Although the Escort and the van were surrounded by a fence, it was not a privacy fence.  Fences "designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas" do not weigh in favor of a finding of curtilage.  *Id*.  It is unclear, however, whether other areas in which the officers searched were likewise visible.  The court also notes that the Escort and the van were not visible from a public road.  Defendant arguably took steps to prevent public access to the Escort by parking it in the far eastern portion of the property, behind grain bins and in tall weeds.  Indeed, the Escort and the van were not visible from the driveway of the house.

Assuming the Escort and the van were on the curtilage of the house, the magistrate judge held the officer's search up until the point of discovering the Escort was not a "generalized search" implicating Fourth Amendment interests.  "'[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways.'"  *United States v. Khabeer*, 410 F.3d

477, 481-82 (8th Cir. 2005) (alteration in original) (quoting *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)).

The court is troubled by the search. Although the officers for the most part stayed on gravel and dirt pathways,[4] they did not act like the typical visitor, salesperson or mail carrier. Instead of driving up to the house on the gravel drive, the officers pressed on. The officers did not restrict their movements to those areas generally made accessible to visitors. The officers meandered down countless gravel and dirt pathways that connected various outbuildings to the house and to one another. Put simply, the officers undertook a thorough search for the Escort on the compound. Although the magistrate judge found the officers "quickly identified" the Escort, the record does not indicate how long the officers searched the compound.

To resolve the Motion to Suppress, however, the court need not decide whether the van was in the curtilage of the farmhouse or whether the officers conducted a "generalized search" of the premises. Regardless of whether the officers' presence in the weeds behind the grain bins was justified, in this case the decisive issue is whether the officers were justified in opening the van door, arresting Defendant and searching the van. The court first considers whether Sergeant McGiverin violated the Fourth Amendment when he opened the van door.

### 2. Automobile Search Exception

Warrantless searches are generally per se unreasonable. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). There are, however, a number of well established exceptions to the rule. *Id.* The government contends the warrantless search of the van falls within the so-called "automobile exception" to the warrant requirement.

---

[4] The officers obviously strayed from the pathways when they inspected the Escort and the van.

*See, e.g., id.* at 1140-41 (citing, in part, *Carroll v. United States*, 267 U.S. 132, 158-59 (1925)). The government bears the burden to prove the automobile exception applies. *Id.* at 1140.

Pursuant to the automobile exception, an officer is permitted to search an automobile without a warrant if probable cause exists to believe that contraband or evidence of criminal activity is located inside. *United States v. Caves,* 890 F.2d 87, 89-90 (citations omitted). The automobile search exception has two justifications: "ready mobility" and "the individual's reduced expectation of privacy in an automobile." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).

The magistrate judge held the officers did not have probable cause to open the van door, and, therefore, the automobile exception did not apply. "Probable cause to search 'exists when there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched.'" *United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004) (quoting *United States v. Murphy*, 69 F.3d 237, 241 (8th Cir. 1995)). The government objects to the Report and Recommendation and argues the officers had probable cause to believe Defendant was in the van because the van was parked next to the Escort which Defendant was reportedly driving.

The court agrees with the magistrate judge's conclusion that the officers did not have probable cause to believe Defendant was in the van. Kelly had told the dispatcher that Defendant was in an Escort on his way to his parent's house. Therefore, when the officers did not find Defendant in the Escort, they had reason to believe he was located in the house, not the van. Simply because a broken-down van is parked near a suspect's car does not give the officers probable cause to believe the suspect is in the van. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to

others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Young*, 184 F.3d 781, 783 (8th Cir. 1999) ("[M]ere proximity to someone for whom probable cause exists does not provide probable cause as to another person . . . ."); *United States v. Knox*, 888 F.2d 585, 587 (8th Cir. 1989) (recognizing that mere physical proximity, even when combined with a brief association with a suspected criminal, does not amount to probable cause). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a *particular* place." *Kennedy*, 427 F.3d at 1141 (emphasis added) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The van was completely silent and dark. Moreover, when the officers opened the van door they had already looked through the van's window and found nothing; this weighs against a finding of probable cause that Defendant was in the van. At best, the officers had a hunch or a reasonable suspicion that Defendant might be hiding in the van. Neither amounts to probable cause. *See United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994) ("The prerequisite to a valid search under the automobile exception . . . is probable cause, not a hunch."); *see also Wong Sun v. United States*, 371 U.S. 471, 479 (1963) ("[A]n arrest with or without a warrant must stand upon firmer ground than mere suspicion."); *United States v. Hoosman*, 62 F.3d 1080, 1081 (8th Cir. 1995) (explaining that probable cause is greater than reasonable suspicion or a hunch). Accordingly, the court overrules the government's second objection to the Report and Recommendation.

Even if the officers had probable cause to open the van door, the court concludes that they were not justified in searching the van without a warrant because the automobile exception does not apply in this case. "The Supreme Court has consistently recognized ready mobility as one of the bases for the automobile exception." *United*

*States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987); *see also United States v. Perry*, 925 F.2d 1077, 1080 n.4 (8th Cir. 1991) (recognizing that Supreme Court is concerned with the vehicle's mobility). "[The automobile] exception is recognized because the mobility of automobiles . . . creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible . . . " *Caves*, 890 F.2d at 89 (internal alterations and quotation marks omitted). As noted in the court's factual findings, the van was on private property, not readily movable and not registered to operate on public streets. The court finds a reasonable and objective observer would conclude that the van was not being used as a vehicle. For these reasons, the government's reliance on the automobile exception is untenable. *Cf. Carney*, 471 U.S. at 393-94 (concluding automobile exception applied to mobile home because it was "readily mobile," "licensed to 'operate on public streets,'" and "so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle").

The court recognizes that "ready mobility is not . . . the only basis for the automobile exception" and "the [F]ourth [A]mendment does not require that officers ascertain the actual functional capacity of a vehicle . . . ." *Hepperle*, 810 F.2d at 840; *see also Labron*, 518 U.S. at 940 (recognizing "the individual's reduced expectation of privacy in an automobile" as a justification for the automobile search exception). "A person's reduced expectation of privacy in his vehicle relaxes the warrant requirement." *Hepperle,* 810 F.2d at 840. The test is reasonableness under the circumstances. *Id.* Because the van's immobility was readily apparent, the court

concludes it was not reasonable for the officers in this case to assume the vehicle was readily mobile. *Id.* Therefore, the automobile exception does not apply.[5]

### 3. Search Incident to Arrest Exception

Although the magistrate judge likewise found the automobile exception did not apply, the magistrate judge recommended that the court deny the Motion to Suppress because (1) the search was conducted pursuant to Defendant's lawful arrest and (2) the search was so attenuated from the violation of Defendant's Fourth Amendment rights that the fruit-of-the-poisonous-tree doctrine did not apply.

The so-called "search incident to arrest" doctrine permits law enforcement officers to search a lawfully arrested individual's person and the immediately surrounding area without a warrant. *Chimel v. California,* 395 U.S. 752, 762-63 (1969); *see also United States v. Riedesel*, 987 F.2d 1383, 1388-89 (8th Cir. 1993) (applying search incident to arrest doctrine). The rationales underlying this exception are (1) the need to remove any weapons with which the arrestee might possibly harm the arresting officers or someone else and (2) the need to prevent the concealment or destruction of evidence. *Riedesel*, 987 F.2d at 1388.

The Supreme Court has applied the search incident to arrest doctrine in cases involving vehicle searches when law enforcement officers have arrested an occupant. *See, e.g., New York v. Belton,* 453 U.S. 454, 460 (1981). "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a

---

[5] A leading commentator agrees. *See* 3 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 7.2(b), at 554-55 (4th ed. 2004) (discussing *Carney* and *Hepperle* and concluding that the automobile exception "would seem inapplicable" in a case where "it was apparent the vehicle was inoperable and that it quite obviously had been in this condition for such a long time as to make it appear there was no significant likelihood of the defendant using the car on the highways in the immediate future").

contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* (footnotes omitted). Notably, in *Belton* the Supreme Court upheld the search of a vehicle even though the defendant was under arrest at the time of the search and the contents of the car were not within his reach; the Court held it was sufficient that the search was "contemporaneous" with the arrest. *See id.* at 462-63.

The court concludes the officers did not conduct a valid search incident to arrest. The van was not readily mobile, and, therefore, *Belton* is inapposite. The van was on private property, not readily mobile and not licensed to operate on public streets; a reasonable and objective observer would conclude that the van was not being used as a vehicle. Indeed, when the officers searched the van, it was apparent that the van was being used as Defendant's sleeping quarters. Defendant was dressed in boxer shorts, a t-shirt and socks. There were a lot of blankets in the van and the back seat was folded down into a bed. Sergeant McGiverin testified that it was apparent to him that someone had been living in the van, or at least sleeping there. The officers should have realized that the van was not readily mobile and the Defendant had a greater expectation of privacy in the van than he would have in the type of automobile contemplated in *Belton*; the van was Defendant's abode for the evening.

The van was thus akin to a home or a motel room. It is true that a number of circuits have held that officers arresting a suspect immediately outside his home may make a "protective sweep" of the home pursuant to the search incident to arrest doctrine. *See, e.g., United States v. Lawlor*, 406 F.3d 37, 41-43 (1st Cir. 2005); *United States v. Cavely,* 318 F.3d 987, 995-96 (10th Cir. 2003); *United States v. Wilson,* 306 F.3d 231, 238 (5th Cir. 2002); *United States v. Colbert,* 76 F.3d 773, 776-77 (6th Cir. 1996); *United States v. Henry,* 48 F.3d 1282, 1284 (D.C. Cir. 1995); *United States v. Oguns,* 921 F.2d 442, 446 (2d Cir. 1990). A number of these circuits

have relied on the Supreme Court's decision in *Maryland v. Buie,* 494 U.S. 325 (1990). *See, e.g., Lawlor*, 406 F.3d at 41-43; *Cavely*, 318 F.3d at 995-96. In *Buie*, the Supreme Court held that following an in-home arrest, an officer may make a protective sweep of the premises if "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334 (quoted in *Lawlor*, 406 F.3d at 41). Such a search, however, is limited to "a cursory inspection of those spaces where a person may be found." *Id.* at 335 (quoted in *Lawlor*, 406 F.3d at 41).

Even if the court were to conclude the Eighth Circuit Court of Appeals would follow the lead of its sister circuits and hold that officers arresting a suspect immediately outside his home may conduct a protective sweep of the home, the search conducted in this case was, nonetheless, not a valid protective sweep. The officers did not have articulable facts to warrant the belief that the van harbored a dangerous person. Nothing in the record warrants the inference that Defendant had a companion, let alone a dangerous one. *Cf. United States v. Carter,* 360 F.3d 1235, 1242 (10th Cir. 2004) (finding that a search conducted inside a home after officers arrested a suspect outside the home was not a lawful protective sweep because "the officers had no reason to believe a third person . . . would attack them while they were outside"); *United States v. Paradis,* 351 F.3d 21, 29 (1st Cir. 2003) (finding protective sweep not warranted because "[t]here was no reason to think that there was another person . . . in the small apartment").

Even if the officers were justified in making an initial protective sweep of the van's passenger compartment, the government has failed to prove that the firearm was located where a dangerous person could be found. The record does not indicate

precisely where the firearm was found within the van. Although the government baldly asserts that the firearm was found "next to a bench" in the van, there is no evidence in the record to support this assertion. Once the officers peered in the van and saw that no one was there, they were obligated to end their search. "*Buie* authorizes protective sweeps for unknown individuals in a house who may hold a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband." *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005). The government has not proven the firearm was in plain view; it is equally if not more likely that the officers had to search in areas where no one could have hidden to find the firearm and ammunition. Because the search incident to arrest doctrine is inapplicable, the search was unconstitutional. Accordingly, the firearm and the ammunition must be suppressed. *See Wong Sun*, 371 U.S. at 487-88 (discussing fruit-of-the-poisonous-tree doctrine).

### 4. Attenuation

Assuming the search incident to arrest was valid, the magistrate judge held the firearm and ammunition need not be suppressed. Although the magistrate judge recognized that "but for" the illegal opening of the door the officers would not have found Defendant, he determined that the search of the van was sufficiently distinguishable to be purged of the taint of the illegal opening of the van door.

The attenuation doctrine is an established exception to the exclusionary rule. *United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991).

> A mere causal connection between information gained during an illegal search and evidence prepared for trial does not require automatic exclusion of the evidence. "[S]uch connection may have become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307 (1939). Moreover, in

> determining whether exclusion is proper, the court does not
> simply inquire whether the evidence would have been
> discovered "but for" the illegal conduct. "Rather, the more
> apt question in such a case is 'whether, granting
> establishment of the primary illegality, the evidence to
> which instant objection is made has been come at by
> exploitation of that illegality or instead by means sufficiently
> distinguishable to be purged of the primary taint.'" *Wong
> Sun v. United States,* 371 U.S. 471, 487-88, 83 S. Ct. 407,
> 417-18, 9 L. Ed. 2d 441 (1963) (quoting Maguire, *Evidence
> of Guilt* 221 (1959)).

*Id.* The Eighth Circuit Court of Appeals has held that some intervening voluntary acts
on the part of the arrestee, such as consenting to the search or resisting arrest, may be
sufficient to purge the taint of an illegality. *See, e.g.*, *United States v. Dickson*, 64
F.3d 409, 410-11 (8th Cir. 1995) (consent); *United States v. Dawdy*, 46 F.3d 1427,
1431 (8th Cir. 1995) (resisting arrest); *United States v. Ramos*, 42 F.3d 1160, 1163-64
(8th Cir. 1994) (consent). To determine whether the taint is purged, the court must
consider: (1) the presence of intervening circumstances; (2) the temporal proximity
between the illegal search or seizure and the intervening act; and (3) the purpose and
flagrancy of the official misconduct. *See United States v. Becker,* 333 F.3d 858, 862
(8th Cir. 2003) (citing in part *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975)).

In the case at bar, the second and third attenuation factors cancel each other out.
It appears there was a very short timeframe between the illegal opening of the van door
and the subsequent discovery of the gun and ammunition. This suggests the taint of
illegality is not purged. On the other hand, the court agrees with the magistrate judge
that the officers did not act in bad faith.

The second factor is thus important in this case. In discussing attenuation, the
Eighth Circuit Court of Appeals has stressed that the intervening act of the Defendant

was "an independent act, causally unconnected" to the illegality, *Dickson*, 64 F.3d at 411, or "sufficiently an act of free will to purge the taint of the preceding detention." *Ramos*, 42 F.3d at 1164. Conversely, the Eighth Circuit Court of Appeals has counseled that "the absence of consent counsels in favor of applying the exclusionary rule." *United States v. Guevara-Martinez*, 262 F.3d 751, 756 (8th Cir. 2001). Unlike the above cited cases, Defendant did not consent or commit any other intervening voluntary act. That there was probable cause to arrest him on the no-contact order may have justified his arrest, but it was not an intervening voluntary act subsequent to the illegal conduct sufficient to purge the taint of the illegality. Weighing the *Becker* factors, the court finds the search was not attenuated.

In reaching a contrary conclusion, the magistrate judge relied heavily upon *United States v. Green*, 111 F.3d 515 (7th Cir. 1997). A close examination of the facts of *Green*, however, indicate it is distinguishable.

In *Green*, police officers saw a car being driven in front of them. *Green*, 111 F.3d at 517. One of the officers remembered that the same car had been parked in front of a fugitive's house the previous night. *Id.* Believing that the occupants of the car might know the fugitive's whereabouts, the officers followed the car. *Id.* The car pulled into a driveway. *Id.* The officers pulled their cruiser across the driveway and blocked in the car. *Id.*

The officers got out and asked the two occupants of the car for identification. *Id.* The occupants complied. *Id.* A warrant check revealed an outstanding warrant for the passenger. *Id.* The officers searched the car and found crack cocaine in a shopping bag on the floor in front of the driver's seat. *Id.* The officers arrested the driver for possession of crack cocaine with intent to distribute. *Id.* The driver filed a motion to suppress. *Id.*

The Seventh Circuit Court of Appeals upheld the denial of the driver's motion to suppress. As a preliminary matter, the court ruled the police violated the Fourth Amendment when they stopped the car and detained the driver and the passenger while checking for warrants. *Id.* at 519-20. The court held, however, that the cocaine was admissible. *Id.* at 520-23. Although the officers would not have discovered the cocaine "but for" the illegal stop, the Seventh Circuit Court of Appeals held "'the causal connection between the illegal police conduct and the procurement of the evidence [was] so attenuated as to dissipate the taint' of the illegal action." *Id.* at 521 (quoting *United States v. Liss*, 103 F.3d 617, 620 (7th Cir. 1997)). The court considered three factors: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.*; *accord Becker*, 333 F.3d at 862 (considering same three factors).

In ruling the procurement of the evidence was attenuated, the Seventh Circuit Court of Appeals seized upon the presence of intervening circumstances. "Specifically, after stopping the [car], the officers discovered there was a warrant outstanding for [the passenger]." Because the officers were entitled to arrest the passenger, they had the right to search the passenger and the passenger compartment of the van incident to arrest. *Id.* (citing *Belton*, 453 U.S. at 459-60 and *United States v. Mitchell*, 82 F.3d 146, 151-52 (7th Cir. 1996)). The court ruled:

> It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of "Olly, Olly, Oxen Free." Because the arrest is lawful, a search incident to the arrest is also lawful. The lawful arrest of [the passenger] constituted

> an intervening circumstance sufficient to dissipate any taint
> caused by the illegal automobile stop.

*Id.* Critically, the court noted that "the purpose of the stop was not to seek evidence against the [passenger or the driver], but to obtain evidence against the [fugitive]." *Id.* at 523. The court thus circumscribed its holding. The also court remarked:

> Our conclusion that the evidence is admissible in this case
> also will not lessen the deterrent effect of the exclusionary
> rule on unconstitutional automobile stops because the
> general rule of exclusion is unchanged. It is only in the
> unusual case where the police, *after* a questionable stop,
> discover that an occupant is arrested on an arrest warrant
> that the intervening circumstances exception will apply.

*Id.* (emphasis added).

*Green* is inapposite for two reasons. First, in the instant case, unlike *Green*, the search incident to arrest was unlawful. Second, it is also undisputed that Sergeant McGiverin's only purpose in opening the van door was to find the Defendant and arrest him. The taint of the original illegality thus did not dissipate as the Seventh Circuit Court of Appeals held it did in *Green*.[6]

In a recent case, the Sixth Circuit Court of Appeals distinguished *Green* for similar reasons. The Sixth Circuit held:

> [W]hen the police make an illegal stop for the very purpose
> of arresting the person stopped, they are thereby exploiting

---

[6] The court also notes that, although Iowa law required the officers to arrest Defendant if they found him, unlike the officers in *Green* the officers in the case at bar did not have a warrant for Defendant's arrest. The *Green* court noted that "[w]here a lawful arrest pursuant to a warrant constitutes the 'intervening circumstance' . . . , it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated." *Green*, 111 F.3d at 521.

> the illegal stop in a manner prohibited by the Fourth
> Amendment and the evidence obtained . . . in a search
> incident to the arrest must be suppressed.
>
> We agree with the Seventh Circuit that the admissibility of
> evidence obtained in an illegal stop depends upon the
> *purpose* of the stop. . . . [T]he officers' purpose in this case
> was clear: to arrest [the defendant].  This they achieved, but
> only by exploiting a stop [in violation of the Fourth
> Amendment].  In determining the proper remedy, we must
> heed the Supreme Court's admonition that the exclusion of
> evidence is required only where it is necessary to vindicate
> the Fourth Amendment's purposes. . . . So that the purpose
> of this requirement may be vindicated, we hold that . . . the
> crack cocaine obtained during the illegal stop must be
> suppressed because it is 'the fruit of the fact that the arrest
> was made pursuant to an illegal stop rather than a legal one.'

*United States v. Hudson*, 405 F.3d 425, 440-41 (6th Cir. 2005) (emphasis in original,
citations omitted) (quoting *New York v. Harris*, 495 U.S. 14, 20 (1990)).

The same analysis in *Hudson* applies here with equal force here.  Sergeant
McGiverin's purpose in opening the van was to find and arrest Defendant. The
intervening arrest of Defendant did not remove the taint of this violation. To vindicate
the Fourth Amendment, the firearms and ammunition found as a consequence of that
arrest must be suppressed.  *Id.*; *see also Wong Sun*, 371 U.S. at 488.

For the foregoing reasons, Defendant's second objection to the legal conclusions
in the Report and Recommendation is sustained and Defendant's Motion to Suppress is
granted.  The firearm and ammunition may not be used as evidence at trial.

## VI. CONCLUSION

**IT IS ORDERED:**

(1)     Defendant Kevin O'Connell's Objections (docket no. 24) to the Report and Recommendation are **SUSTAINED**;

(2)     The government's Response (docket no. 25) to the Report and Recommendation is **OVERRULED**;

(3)     The magistrate judge's Report and Recommendation (docket no. 21) is **SET ASIDE**;

(4)     Defendant Kevin O'Connell's Motion to Suppress (docket no. 12) is **GRANTED**; and

(5)     The time between the filing of Defendant's Motion to Suppress and the date of this Order is hereby excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

**DATED** this 7th day of December, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA